**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name:  07a0121n.06
Filed:  February 15, 2007

**05-2333**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| DELORES EGGERSON, Personal Representative of the Estate of Leon Dandredge, Deceased, | ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE |
| MARK HESSLER, | ) ) | WESTERN DISTRICT OF MICHIGAN |
| Defendant-Appellee. | ) | |

Before:  BOGGS, Chief Judge, DAUGHTREY, Circuit Judge, and MILLS,[*] District Judge.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  This <u>Bivens</u>[1] action arose from the shooting death of the plaintiff's decedent, Leon Dandredge, by the defendant, U.S. Deputy Marshal Mark Hessler.  When the shooting occurred, Hessler and his partner were searching for Dandredge in the basement of a house in an attempt to arrest him pursuant to a warrant.  The plaintiff filed suit, contending that Hessler used excessive force in violation of the Fourth Amendment and that Hessler was not entitled to qualified immunity.

---

[*]The Hon. Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

[1]<u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 405 U.S. 388 (1971).

The district court granted summary judgment to the defendant, finding that there were no disputed issues of material fact and concluding as a matter of law that Dandredge's Fourth Amendment rights were not violated. The court also noted that the defendant would have been entitled to qualified immunity in any event. Because we conclude that the district court correctly decided the issues of fact and law before it, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Most of the facts leading up to the shooting were not disputed in the district court. The record developed there established that Hessler, assigned to the U.S. Marshal's Office in Grand Rapids, Michigan, received information in June 2003 from the U.S. Marshal's Office in Indianapolis that an arrest warrant had issued for Leon Dandredge based upon multiple parole violations and that Dandredge was believed to be in Muskegon, Michigan. In his effort to find and arrest Dandredge, Hessler received and read a file on the fugitive indicating, *inter alia*, that Dandredge had a history of arrests for assault and battery and that failure to attend court-ordered anger-management counseling was listed among his parole violations.

Throughout that summer, Hessler investigated Dandredge's whereabouts and made contact with multiple sources who confirmed that Dandredge was in the Muskegon area. It eventually became clear to Hessler that Dandredge knew he was being sought and was actively eluding arrest. At one point, Dandredge spoke over the phone with Detective Chad Nader, a local police detective who had become involved in the case because Dandredge

was also being sought by the police in relation to alleged sexual criminal conduct in Michigan. Dandredge asked Nader whether the "feds" were looking for him, and Nader told him that the Marshals had an arrest warrant citing him for parole violations, to which Dandredge responded that he did not want to go back to jail. Although Dandredge assured Nader that he would turn himself in on a date certain, he did not do so. Nader conveyed the substance of this conversation to Hessler.

On the day of the shooting, August 20, 2003, Hessler and his partner, Kenneth Groenveld, had received information that Dandredge might be hiding out with his girlfriend, Wanda Henderson, who resided in a house in Muskegon. Hessler and Groenveld went to that location to investigate. After an initial delay, Henderson answered the door and indicated in response to their inquiry that Dandredge was not there but, nonetheless, consented to the officers' search of the premises. After searching the main living area, the officers asked whether Dandredge was in the basement of the house. Henderson replied, "I don't know." The officers then went to search the basement.

As the officers descended the stairs together, Hessler indicated their presence by loudly announcing that they were United States Marshals and were there to serve an arrest warrant on Dandredge. Hessler also drew his weapon and kept it at his side. The basement was dimly lit and very cluttered. At the bottom of the steps, to the north, was a small laundry room. The room contained a washer and dryer and piles of clothing and other items. Groenveld took a step into the room and looked around, but he did not see

Dandredge. The officers then proceeded to search through the remaining rooms of the basement, repeatedly announcing their presence as they went. Unable to find Dandredge, they began to head out of the basement, Groenveld in the lead and Hessler following. As Groenveld ascended the stairs, Hessler noticed an abnormally large pile of clothing in the laundry room and decided to investigate further.

What happened next was the subject of disagreement between the parties. Hessler described the laundry room as small, measuring 11 feet 4 inches from the west to east walls and 6 feet 8 inches from the north to south walls, with an entrance on the south wall of the room that was 7 feet 6 inches from the west wall. He testified that after deciding to investigate the pile of laundry, he stepped into the laundry room and toward the northwest corner. At that point, he said, he reached for a blanket atop a large pile of clothes in order to ascertain whether Dandredge was hiding there and, without making a sound, Dandredge bolted upright, lunging upward at Hessler out of the pile of clothing. According to Hessler, Dandredge was almost on top of him, although not in actual contact, and it appeared to Hessler that Dandredge had ambushed him in an attempt to overpower him physically. Unsure whether Dandredge was armed, Hessler said that it crossed his mind that Dandredge might be trying to get control of his weapon, and he therefore fired one shot at Dandredge while stepping backward toward the doorway. Hessler later estimated that he was only one to two feet from Dandredge when he fired. The shot hit Dandredge in the head, wounding him fatally. All of this, Hessler said, occurred in an instant. Later, it was determined that Dandredge was unarmed at the time.

The plaintiff contended that the shooting could not have occurred the way Hessler described it. Her first claim was that because the laundry room was larger than Hessler testified, he must have been farther away from Dandredge than he said. This argument has been expressly abandoned on appeal. What is now at issue is the plaintiff's second argument, which is based on what she contends is evidence establishing that Dandredge did not lunge at Hessler. That evidence is discussed in more detail below.

After the plaintiff brought this action against Hessler and Groenveld, alleging excessive force in violation of the Fourth Amendment, both defendants filed motions for summary judgment. The district judge granted Groenveld's summary judgment motion, and that decision is not before us. After allowing time for further discovery, the district judge granted summary judgment in Hessler's favor also, finding that there were no disputed issues of material fact and that, as a matter of law, Dandredge's Fourth Amendment rights had not been violated.

**DISCUSSION**

We review a district court's grant of summary judgment *de novo*. See Michigan Bell Tel. Co. v. MFS Intelenet of Michigan, Inc., 339 F.3d 428, 433 (6th Cir. 2003). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We must view all evidence and any factual inferences in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-

88 (1986).  Once the moving party has sufficiently informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate, and the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586.  Rather, the plaintiff must come forward with affirmative evidence upon which a rational jury could find for the plaintiff.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 252, 256-57 (1986).

Because it requires little analysis to conclude that if the incident occurred in the manner described by Hessler, there was no constitutional violation, the dispositive issue in this case is whether there are any genuine issues of material fact that contradict Hessler's version of events.  In the district court, the plaintiff relied on two pieces of evidence in an attempt to prove that Dandredge had not lunged at Hessler:  (1) the affidavit of her expert, David Balash, stating that Dandredge "was not violently attacking Mark Hessler by bolting up toward him," and (2) Groenveld's deposition, in which, according to the plaintiff, Groenveld testified that Dandredge was sitting on his buttocks with his legs straight out in front of him immediately after he was shot, thereby negating Hessler's assertion that he bolted upward at him.  The plaintiff also argued that blood-spatter analysis setting the height of the bloodletting injury at 35 inches conflicted with Hessler's deposition testimony regarding Dandredge's position at the time of the shooting, thereby creating a question of whether Hessler was actually attacked.

The district court found that the Balash affidavit was entirely conclusory and therefore insufficient to defeat summary judgment, citing Williams v. Ford Motor Co., 187 F.3d 533, 543-44 (6th Cir. 1999). On appeal, the plaintiff again relies on the affidavit but fails to address the district court's ruling, which we find was correct and which prevents reliance on this evidence to establish the proposition for which it was offered below. See United States v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996) ("[i]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks and citations omitted). A reading of the Balash affidavit shows that although Balash mechanically listed the facts he relied upon to make his conclusions, he did not reveal, even in a most basic sense, the "process of reasoning" or "inferential process" he relied on in making his conclusions. See Williams, 187 F.3d at 544.

The district court also rejected the plaintiff's reading of Groenveld's testimony, noting that despite counsel's repeated attempts to get him to testify otherwise, Groenveld had unequivocally testified that he never saw Dandredge's lower body because it was covered by clothing and that he could only speculate as to whether Dandredge was crouched or sitting on his buttocks. Hence, the only credible evidence regarding the position of Dandredge's body came from a police report indicating that he was found in a crouched position. That evidence was completely consistent with Hessler's version of events.

With regard to the blood-spatter evidence, the plaintiff apparently argues that a bloodstain pattern analysis performed by a state forensic expert demonstrated that Dandredge was in the northwest corner of the room when shot, as evidenced by "a stain on the north wall approximately 15 inches from the west wall, 35 inches above the floor." Arguing from a pathologist's report that Dandredge was rendered immediately unconscious by the bullet to his head, the plaintiff now puts forward the following:

> Therefore, Plaintiff's theory is that the forensic evidence shows that Dandredge's head was near the corner between the wall and the side of the dryer between 24 and 36 inches from the floor where he was shot. From this, Plaintiff's theory is that Dandredge was not lunging toward Hessler when Hessler shot him in the head.

The problem, of course, is that the plaintiff's conclusion is no more than theory and does not establish a factual basis for the proposition that plaintiff would have us adopt, *i.e.*, that "the blood spatter evidence . . . makes clear a genuine dispute as to whether Dandredge was acting aggressively or was planning to give himself up" because it is "consistent with Plaintiff's claim that Dandredge was either sitting or was nearly sitting on the floor when he was shot." Obviously, these are mere conclusions, and the plaintiff fails to explain how the evidence of the height of the blood spatters conflicts with Hessler's testimony or indicates that Dandredge was not lunging. Moreover, as the district court pointed out, "there [wa]s clear evidence that Dandredge was rising from his hiding place when he was shot, for his body was found only partially concealed in a squatting position." In addition, the plaintiff's theory that Dandredge might have intended to give himself up is belied by the

fact that he never made a sound in response to the marshals' repeated invitations that he do so.

We conclude that the plaintiff has simply failed to show that there is a genuine issue of material fact as to how the shooting occurred or to refute that it happened just as Hessler testified. Viewing the facts in the light most favorable to the plaintiff, we must therefore assume that when Hessler neared Dandredge's hiding space, Dandredge silently and forcefully bolted upward in a movement that could be perceived as an attack, and that Hessler, reasonably perceiving it as such, fired out of a concern for his own safety.

In the absence of disputed facts concerning the shooting, the district court correctly proceeded to determine as a legal matter whether the use of force in this case was excessive, in violation of Dandredge's rights under the Fourth Amendment. The court determined that there was no constitutional violation and, therefore, did not find it necessary to determine whether Hessler was entitled to qualified immunity.

Claims of excessive force in the course of an arrest "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." See Sample v. Bailey, 409 F.3d 689, 696 (6th Cir. 2005) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). Use of deadly force is constitutionally reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." See id. at 696-97 (quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 697 (quoting Graham, 490 U.S. at 396). Also, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. (quoting Graham, 409 U.S. at 396-97).

On the undisputed facts of this case, we conclude – as did the district court – that there is no genuine issue of material fact as to the reasonableness of Hessler's perception that he was under threat of serious physical harm. Hessler knew that Dandredge had a history of arrests and one conviction for assault and battery. He knew that Dandredge was willing to go to some length to avoid arrest, given that he had been actively eluding arrest and had stated to Nader that he did not want to go back to jail. The room was small, cluttered, and dimly lit, and Dandredge was hiding and silent. Despite Wanda Henderson's equivocation, Hessler had no way of knowing for sure that Dandredge was actually present in the basement. When Dandredge suddenly lunged at Hessler without warning, from Hessler's point of view the situation had all the hallmarks of an ambush. Hessler was within two feet of him and did not know at that point whether Dandredge was armed. It was certainly reasonable for him to fear that Dandredge was near enough to him to physically overpower him and take his weapon. Significantly, these events happened with split-second rapidity, leaving little time for further investigation or reflection on Hessler's part. Under these circumstances, we cannot say that the use of deadly force was unreasonable.

## **CONCLUSION**

For the reasons set out above, we AFFIRM the judgment of the district court.