Keith **LANDER**, et al., Plaintiffs,

v.

**MONTGOMERY COUNTY BOARD OF COMMISSIONERS**, et al., Defendants.

No. C–3–00–487.

United States District Court, S.D. Ohio, Western Division.

Aug. 22, 2001.

<hr />

**1046**

James R. Greene, III, Dayton, OH, for Plaintiffs.

John F. Krumholtz, Dayton, OH, for Defendants.

DECISION AND ENTRY OVERRULING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DOC. # 2); PLAINTIFFS' MOTION FOR ORDER THAT NO BOND BE REQUIRED (DOC. # 3) OVERRULED, AS MOOT; PLAINTIFFS' MOTION IN LIMINE (DOC. # 7) OVERRULED; PLAINTIFFS' MOTION FOR DISCOVERY (DOC. # 9) OVERRULED, AS MOOT; PLAINTIFFS' MOTION FOR CONDITIONAL CLASS CERTIFICATION (DOC. # 15) OVERRULED; CONFERENCE CALL SET.

RICE, CHIEF JUDGE.

This litigation involves a challenge to the use of assessment tests to establish eligibility lists for promotions in the Montgomery County (Ohio) Public Works Department. The Plaintiffs are Montgomery County employees Keith Lander, Jeffrey A. Pryor, Levinsky Allen and James E. Williams. They allege that the assessment tests have a disparate impact on African Americans, who score significantly worse than Caucasian test takers. On September 25, 2000, the Plaintiffs filed a nine-count Complaint, asserting a variety of state and federal claims involving the testing process. (Complaint, Doc. # 1). Among other things, the Plaintiffs seek declaratory and injunctive relief. Named as Defendants in this action are the Montgomery County Board of Commissioners and a number of Montgomery County employees, who have been sued in their "individual" and "official" capacities.[1] Pending before the Court are the following five Motions filed by the Plaintiffs: (1) a Motion for a Preliminary Injunction (Doc. # 2); (2) a Motion for an Order that no bond be required (Doc. # 3); (3) a Motion in Limine (Doc. # 7); (4) a Motion for Discovery (Doc. # 9); and (5) a Motion for Conditional Class Certification (Doc. # 15).

In October and November, 2000, the Court conducted a three-day oral and evidentiary hearing on the Plaintiffs' Motion for a Preliminary Injunction. (See Transcripts, Doc. # 24–26). The Court subsequently heard final arguments on December 20, 2000. The Motion for a Preliminary Injunction and the other four Motions are now before the Court for resolution. As a means of analysis, the Court first will address the Plaintiffs' Motion in Limine (Doc. # 7) and Motion

---

1. The County employees who have been named as Defendants in this action are: (1) Administrator Deborah Feldman; (2) Building Maintenance Superintendent Jeff Trick; (3) Personnel Director Leon Walker; (4) Public Works Director and Assistant County Administrator James T. Dinneen; (5) Custodial Works Supervisor Bill Engle; (6) Building Maintenance Supervisor Ken Stomps; (7) Sanitation Maintenance Supervisor Matt Baker; (8) Sanitation Supervisor Gary Brown; (9) Deputy Director of Sanitation Rick Westerfield; (10) former Building Maintenance Superintendent William Hunter; (11) Assistant County Administrator Sue Daily; (12) Director of Sanitation Jim Bergaman; and (13) Building Maintenance Supervisor Tom Grimmett. (Complaint, Doc. # 1).

for Discovery (Doc. # 9). The Court then will turn to the Motion for a Preliminary Injunction (Doc. # 2) and the related bond Motion (Doc. # 3). Finally, the Court will resolve the Plaintiffs' Motion for Conditional Class Certification (Doc. # 15).

## I. *Motion in Limine (Doc. # 7)*

The Plaintiffs filed this Motion on October 12, 2000, seeking to preclude defense witness Christa Davies from providing expert testimony about the assessment tests at issue. The Court previously deferred ruling on the Motion, electing to hear her testimony before deciding its admissibility. (Doc. # 26 at 3–4).

At the oral and evidentiary hearing in this matter, Davies testified that she works as a testing assessment coordinator for the Miami Valley Career Technology Center ("CTC"). (Doc. # 25 at 156). Davies also testified that she spoke with representatives of Montgomery County and reviewed job descriptions in order to select an assessment test that she believed would accurately measure the skills needed for successful employment in the County's Public Works Department. During the course of Davies' testimony, the Court found that she possessed sufficient expertise to testify about selecting a standardized test to assess particular jobs. (*Id.* at 170). The Court also ruled that any shortcomings in her expertise affected the weight of her testimony rather than its admissibility. (*Id.*). Based on that ruling,

and the other rulings made by the Court in the course of Davies' testimony, the Plaintiffs' Motion in Limine (Doc. # 7) is overruled.[2]

## II. *Motion for Discovery (Doc. # 9)*

The Plaintiffs filed this Motion on October 16, 2000, seeking access to one of the assessment tests at issue. The Court resolved this discovery dispute with counsel during the course of the oral and evidentiary hearing, and the Plaintiffs have received a copy of the test, which was ordered filed under seal and subject to a protective order. (Doc. # 25 at 101–02). Accordingly, the Plaintiffs' Motion for Discovery (Doc. # 9) is overruled, as moot.

## III. *Motion for a Preliminary Injunction (Doc. # 2)*

The Plaintiffs filed this Motion on September 25, 2000, seeking to enjoin the Defendants' continued use of assessment test scores and resulting eligibility lists and rankings to fill vacancies in the Montgomery County Public Works Department. The job openings at issue are for employment in classifications identified as Building Maintenance Mechanic I ("BMM I"), Building Maintenance Mechanic II ("BMM II"), and Building Maintenance Mechanic III ("BMM III"). The BMM I position is an entry-level classification, whereas the BMM II and BMM III positions require a certain level of knowledge in one or more skilled trades.

**2.** Parenthetically, the Court notes that Davies testified almost exclusively about her selection of a standardized mechanical reasoning and "information locating" test to assess job applicants for the entry-level position of Building Maintenance Mechanic I. (*See, generally,* Doc. # 25 at 155–94). In their Motion in Limine, however, the Plaintiffs sought to prevent Davies from testifying about four separate "skilled trades" tests that were used to assess applicants for higher-level positions

such as Building Maintenance Mechanic II and III. The Court notes that Davies provided very little, if any, such testimony, and on cross examination the Plaintiffs exposed her lack of knowledge about skilled trades such as carpentry, HVAC, plumbing and electrical work. (*Id.* at 186). For purposes of its analysis herein, the Court has not relied on any testimony from Davies that would require substantive knowledge of the skilled trades.

In support of their Motion, the Plaintiffs contend that Montgomery County's assessment testing process violates Title VII, because it has a disproportionately adverse impact on African Americans. In other words, the Plaintiffs allege that the pass rate for black test takers was significantly lower than the pass rate for white test takers. Additionally, even among individuals who passed one or more of the tests, the Plaintiffs suggest that they had an unlawful disparate impact on African Americans, whose scores were lower than those achieved by some less-experienced Caucasians, which resulted in whites being promoted ahead of them. Finally, the Plaintiffs assert that the Defendants' decision to open the testing process only to employees of the Public Works Depart-

ment disparately impacted African Americans employed elsewhere, as they were barred from taking the tests.[3] In addition to seeking a preliminary injunction of the basis that the assessment tests violate Title VII, the Plaintiffs seek injunctive relief on the theory that the testing process violates a collective bargaining agreement ("CBA") between Montgomery County and their labor union, the American Federation of State, County, and Municipal Employees, AFL–CIO ("AFSCME").

## A. Findings of Fact [4]

The evidence presented at the oral and evidentiary hearing establishes that Montgomery County implemented the challenged assessment testing process in response to complaints from the NAACP

**3.** As will be explained more fully, *infra,* in order to prevail on their "disparate impact" claim, the Plaintiffs must show more than that Montgomery County's use of the assessment tests prevented *them personally* from receiving a promotion. In order to prevail on their claim, the Plaintiffs must show that the assessment tests had a disproportionately adverse impact on them *and* other African Americans, as compared to Caucasians. *See, e.g., Cerrato v. San Francisco Community College Dist.,* 26 F.3d 968, 976 (9th Cir.1994) ("To prevail on [a disparate impact] claim, [a plaintiff] must show that the defendants employed certain hiring criteria that had an adverse impact on him and members of his group.").

**4.** During the oral and evidentiary hearing in this matter, the Court admitted into evidence all of the Exhibits offered by the Plaintiffs. (Doc. # 25 at 152–54). Consequently, when rendering its Findings of Fact and Conclusions of Law, the Court will consider those Exhibits in addition to the various witnesses' testimony. Following the oral and evidentiary hearing, the Defendants submitted a list of the Exhibits that they wished to offer into evidence. A review of that list reveals that the Defendants have offered Defense Exhibits 1–7, 11–14, 16–17, 19, 20–22, 24 and 26. (Doc. # 34). In response, the Plaintiffs have objected to the admission of Defense Exhibits 4, 20 (in part) and 22 on the basis of relevance and/or speculation. (*Id.*). Upon re-

view, the Court overrules the Plaintiffs' objections and hereby admits all of the Defendants' offered Exhibits into evidence. With respect to the three challenged Exhibits, the Court has not found a need to rely upon them to resolve the pending Motion for a Preliminary Injunction, but it nevertheless has admitted them so that they may be a part of the record. Finally, the Plaintiffs have moved the Court to admit into evidence Defense Exhibits 8–10, which have not been offered by the Defendants. (Doc. # 34). The Defendants oppose this request, arguing that Defense Exhibits 8–10 were neither identified nor referred to during the oral and evidentiary hearing. (*Id.*). Upon review, the Court will overrule the Plaintiffs' request to admit Defense Exhibits 8–10 into evidence. The Court's Minutes show that Exhibits 8–10 were not identified by any witness during the oral and evidentiary hearing (*see* Doc. # 14, 16), and the Plaintiffs cite nothing to the contrary. In any event, the Court notes that it has found no need to rely on Defense Exhibits 8–10 for purposes of its analysis herein. Defense Exhibits 8 and 10 appear to be sample assessment test questions. Defense Exhibit 9 appears to be a page from a manual discussing test development. In short, nothing contained in these Exhibits would alter the Court's analysis of the Plaintiffs' Motion for a Preliminary Injunction.

and the Plaintiffs about the lack of promotional opportunities for minorities in the Public Works Department. (Feldman testimony,[5] Doc. # 26 at 226–32; Dinneen testimony, Doc. # 24 at 69–72; Walker testimony, Doc. # 26 at 171–74; Allen testimony, Doc. # 26 at 198–99). Among other things, the minority employees complained that despite their qualifications, they were being passed over for promotions due to competition from outside candidates. (Feldman testimony, Doc. # 26 at 231). They also complained that they had not been given the opportunity to demonstrate their ability to perform higher-level work. (*Id.* at 232).

In an effort to address the various complaints articulated by the NAACP, the Plaintiffs and other African American employees, the County contracted with the CTC for the selection, creation and administration of the assessment tests at issue in this litigation. (Feldman testimony, Doc. # 26 at 222–23). Prior to designing the tests, representatives of CTC met with County representatives to discuss the BMM job classifications and the requirements of those positions. (Trick testimony, Doc. # 25 at 137). During the meetings, CTC employees also received examples of old test questions that the County had used to fill vacant BMM positions. (*Id.* at 92–94, 137). In addition, CTC representatives reviewed written job descriptions, but they did not visit the Department of Public Works to observe the BMM jobs actually being performed. (*Id.* at 79, 106).

The CTC ultimately selected, or created, and administered five assessment tests for Montgomery County.[6] (Feldman testimony, Doc. # 25 at 13). The first test, which has been identified as the "ACT test," assessed mechanical reasoning and "information locating" skills. (Trick testimony, Doc. # 25 at 85). It was used by the County to rank applicants to fill vacancies in the BMM I job classification, which is an entry-level BMM position in the Department of Public Works. Four separate "skills tests" were used to rank applicants to fill vacancies in the BMM II and BMM III job classifications, which require a certain degree of knowledge in the skilled trades. The four skills tests assessed competence in the following areas: (1) electrical, (2) plumbing, (3) carpentry, and (4) HVAC. (Feldman testimony, Doc. # 25 at 13). Each of the four skills tests included a "hands on" and a written component. (Trick testimony, Doc. # 25 at 34). Although the four skills tests were used to evaluate applicants for BMM II and BMM III jobs, which were advertised as "journey-level" positions, the County instructed CTC to create tests that did not require true "journey-level" knowledge. In fact, the skills tests designed and administered by the CTC required only a high-school level of knowledge in order for a test taker to obtain a good score. (Dinneen testimony, Doc. # 24 at 91; Trick testimony, Doc. # 25 at 33). CTC representative Lou Warren described the skills test questions as "elementary" and "very basic questions that were fair questions at entry level." (Warren testimony, Doc. # 26 at 77, 82). According to CTC instructor Joel Cole, the skills tests were "below" (i.e., easier than) the entry-level tests that he gives to his own students. (Cole testimony, Doc. # 26

**5.** The transcript of proceedings on October 16, 2000, incorrectly identifies portions of Feldman's testimony as the testimony of another witness, Gregory Hopkins. (*See* Transcript, Doc. # 26 at 221–26).

**6.** The record reflects that the BMM I mechanical reasoning and "locating information" test administered by CTC was a standardized test that it had selected. CTC actually created the BMM II and BMM III tests after reviewing old test questions supplied by Montgomery County.

at 112). Likewise, CTC instructor Kelly. Kramer described the skills tests as "basic." (Kramer testimony, Doc. #26 at 119).

After CTC provided the five assessment tests, Montgomery County waived its traditional "minimum qualification" requirements and offered the tests to *all* employees of its Public Works Department. (Dinneen testimony, Doc. #24 at 72; Walker testimony, Doc. #26 at 176). The County excluded other potential applicants from the testing process, however, in order to maximize the promotional opportunities for Public Works Department employees. (Dinneen testimony, Doc. #24 at 71–72; Feldman testimony, Doc. #26 at 231–32). The record reflects that thirty eight Public Works Department employees subsequently completed at least one of the five assessment tests. (Trick testimony, Doc. #25 at 83). More specifically, the thirty eight employees completed a total of ninety nine tests in the following assessment areas: [7] (1) twenty employees completed the mechanical reasoning and "information locating" test for the BMM I classification; (2) twenty employees completed the electrical skills test for the BMM II or BMM III classification; (3) twenty one employees completed the plumbing skills test for the BMM II or BMM III position; (4) twenty two employees completed the carpentry

skills test for the BMM II or BMM III position; and (5) sixteen employees completed the HVAC skills test for the BMM II or BMM III position.

In order to be eligible for promotion into a BMM I position,[8] individuals were required to score in at least the 50th percentile on the mechanical reasoning portion of their test, and they were required to demonstrate at least "Level 3" proficiency on the "information locating" assessment.[9] (Def.Exh.6). Test takers who sought a promotion into a BMM II position were required to answer at least seventy percent of the questions correctly on both the "hands on" and the "written" portions of at least *one* skills test. (Def. Exh. 6; Trick testimony, Doc. #25 at 33–35). Test takers who sought a promotion into a BMM III position were required to answer at least seventy percent of the questions correctly on at least *two* skills tests.[10] (Def. Exh. 6; Trick testimony, Doc. #33–35). Individuals who met the foregoing requirements were placed on one or more eligibility lists for promotion into BMM I, BMM II or BMM III positions and ranked according to their test scores.[11] As a result, the assessment tests served two functions. *First,* they served a gate-keeping function, insofar as test takers were required to obtain a minimum threshold score in order to be placed on a promotion eligibility list.

7. Participating employees were allowed to take as many or as few of the five tests as they desired.

8. Although BMM I was an entry-level classification in the BMM job series, employees from non-BMM jobs in the Public Works Department took the assessment tests in order to obtain a "promotion" into the BMM I classification.

9. "At Level 3[,] employees can read elementary workplace graphics such as simple order forms, flow charts, tables, instrument gauges, and floor plans. They can find one or two pieces of information in these types of graphics and fill in one or two pieces of information

that are missing form [sic] these types of graphics." (Def.Exh.6).

10. Seventy percent accuracy "was considered to be a fair reflection of competency as this is the score required by most of the state programs to verify proficiency, and also by the Ohio Competency Analysis Profiles (OCAP) standards." (Def.Exh.6).

11. As a result of their test scores, some individuals were placed on more than one eligibility list. For example, a BMM I employee who successfully completed two skills tests was eligible for promotion into either a BMM II or BMM III position. As a result, such an individual's name was placed on both lists.

*Second,* the tests also served a ranking function, insofar as all test takers who achieved a passing score were ranked on a promotion eligibility list in the order of their scores.

With respect to the BMM I positions, successful test takers were ranked on the basis of their test score and the results of an interview. (Trick testimony, Doc. # 25 at 75). With respect to the BMM II and BMM III positions, successful test takers were ranked solely on the basis of their skills test scores, and other factors, including seniority, were not considered. (Trick testimony, Doc. # 25 at 64). When establishing rankings for the BMM II positions, the County looked at a test taker's *single* best skills test score, regardless of how many skills tests that individual had completed. (Trick testimony, Doc. # 25 at 115, 127–28). When establishing rankings for the BMM III positions, the County looked at a test takers *two* best skills test scores and averaged them, regardless of how many skills tests that individual had completed.[12] (*Id.*). The County also decided to use the promotion eligibility lists

to fill any BMM vacancies occurring over a 24–month period from the date that the lists were established. (Walker testimony, Doc. # 26 at 176).

The evidence reflects that of the thirty eight employees who completed one or more of the five assessment tests,[13] eighteen were African Americans.[14] (Pl. Exh.71, 71(a)). As noted, *supra,* the thirty eight employees completed a total of ninety nine assessment tests. (*Id.*). Fifty nine of the ninety nine tests received a passing score. (*Id.*). Eleven of the tests that received a passing score were taken by African Americans.

Twelve African Americans and eight Caucasians took the BMM I mechanical reasoning and "information locating" test. (Pl.Exh.71(a)). Four of the twelve African Americans and six of the eight Caucasians passed the test,[15] as required in order to be eligible for promotion into a BMM I position. (*Id.*). Eleven African Americans and nineteen Caucasians took at least one skills test. Three of the eleven African Americans and fourteen of the nineteen Caucasians passed at least one skills test,

---

12. In other words, an individual who completed all four of the skills tests had only his best score considered for purposes of his rank on the BMM II promotion eligibility list, and only his two best scores considered for purposes of his rank on the BMM III list. As a result, a test taker could not be "penalized" for taking all four tests. During a meeting held prior to the testing, County representative Jim Dinneen made clear that only a test taker's "top" scores would be considered. (Dinneen testimony, Doc. # 24 at 74).

13. Three additional employees, Plaintiff Allen, Willis Pelaston and Robert Mills, signed up to take one or more assessment tests but later withdrew from them all. (*See* Pl. Exh. 71(a)).

14. Some of the Plaintiffs' statistics identify the eighteen test takers generally as "minorities," but they more accurately should be referred to as African Americans, as they are identified elsewhere in the record. (*See* Pl. Exh. 71 and 71(a)). Although this distinction may seem insignificant, at least two federal circuit

courts have found that it is not. *See Mems v. City of St. Paul, Dept. of Fire and Safety Services,* 224 F.3d 735, 740–41 (8th Cir.2000) (stating that African American plaintiffs ordinarily may not group all minorities together to establish that an examination had a disparate impact on their protected class); *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 346 (10th Cir.1975) (rejecting the idea of grouping minorities such as African Americans, Chicanos, Orientals and American Indians together for purposes of conducting a Title VII disparate impact analysis).

15. The Plaintiffs' statistics do not specifically identify the race of the non-African American test takers. For present purposes, the Court has simply chosen to refer to those individuals as "Caucasians," rather than identifying them in a more cumbersome manner such as "non-African Americans" or "individuals of other races."

as was required in order to be eligible for promotion into a BMM II position. (*Id.*). Finally, eight African Americans and fifteen Caucasians took two or more skills tests. Three of the eight African Americans and thirteen of the fifteen Caucasians passed at least two skills tests, as was required in order to be eligible for promotion into a BMM III position. (*Id.*).

With respect to the four Plaintiffs in this case, James Williams was ineligible to take any of the assessment tests. As noted, *supra*, the tests were open only to Public Works Department employees, and Williams is employed in the Montgomery County Sanitation Department. (Martin testimony, Doc. # 26 at 135–36). Although Plaintiff Levinsky Allen is employed in the Public Works Department and, therefore, was eligible to take the assessment tests, he declined to do so on the advice of AFSCME, his labor union. Specifically, a representative of AFSCME informed Allen that the assessment tests were "a farce." (Allen testimony, Doc. # 26 at 195). Based on information that he received from the union representative, Allen concluded that the tests were "bad news," and he refused to participate in them.[16] (*Id.* at 200). Plaintiff Keith Lander took

the BMM I mechanical reasoning and "information locating" test. Although he achieved a passing score on the "information locating" portion of the test, he scored in the 40th percentile on the mechanical reasoning portion. (Pl. Exh. 70 at 6). Given that test takers were required to score at or above the 50th percentile in order to be eligible for a promotion, Lander was not included on the promotion eligibility list for a BMM I job. Finally, Plaintiff Jeffrey Pryor, who was working as a BMM II when the assessment tests were given, passed the two skills tests that he took. As a result of his scores, he ranked 8th on the promotion eligibility list for a BMM III position. (*Id.* at 3). During pendency of this litigation, Montgomery County reached Pryor's spot on the list and offered him a promotion into a BMM III position on January 8, 2001. Pryor declined the offer, however, on the advice of his legal counsel, who informed the County that his client would not accept a promotion that resulted from the allegedly discriminatory assessment tests.[17]

## B. *Conclusions of Law*

This Court considers four factors when deciding whether to grant a preliminary

---

**16.** Although Allen did not articulate the union's concern, AFSCME strongly believes, as do the Plaintiffs, that Montgomery County's implementation of the assessment testing process violates the terms of the applicable CBA.

**17.** The Court has received copies of:(1) a letter from Montgomery County representative Jeff Trick to Pryor, offering Pryor a promotion into a BMM III position; (2) two letters from the Plaintiffs' counsel to representatives of Montgomery County, stating that Pryor would not accept the offered promotion; and (3) a response from counsel for the County, advising Pryor to reconsider and to accept the promotion. Copies of the foregoing correspondence are attached to this Decision and Entry.

For the reasons set forth more fully, *infra,* the Court finds the correspondence from the

Plaintiffs' counsel to be highly relevant to certain issues in this case. That correspondence is non-hearsay under Fed.R.Evid. 801(d)(2), because it qualifies as an admission of a party-opponent. Although that correspondence has not been authenticated, the Court notes that it is written on the letterhead of the Plaintiffs' counsel, and it bears counsel's signature. It also contains a summary of counsel's legal advice to Pryor. In short, the correspondence gives every indication that it is in fact what it purports to be. As a result, the Court will consider the correspondence from the Plaintiffs' counsel in its analysis of the Plaintiffs' Motion for a Preliminary Injunction. If counsel for the Plaintiffs disputes the authenticity of the correspondence, he must so advise the Court within 72 hours from date, and the Court will revisit the issue.

injunction. Those factors are: (1) the likelihood that the party seeking relief will succeed on the merits of the claim; (2) whether the party seeking relief will suffer irreparable harm without the preliminary injunction; (3) the probability that granting the requested relief will cause substantial harm to others [18]; and (4) whether the public interest is advanced by the issuance of a preliminary injunction. *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994). These four considerations are factors to be balanced, rather than prerequisites that must be met. *Id.* The Court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir.2001). With the foregoing requirements in mind, the Court turns now to its consideration of the evidence before it.

■ During the oral and evidentiary hearing held in October and November, 2000, the Plaintiffs attempted to establish that the use of the assessment tests and resulting promotion lists to fill vacancies in the Public Works Department violates both Title VII and the terms of a CBA between Montgomery County and AFSCME, their labor union. Such allegations are also included in Plaintiffs' Com-

plaint, and those allegations constitute the basis for the pending Motion for a Preliminary Injunction.[19]

With respect to Montgomery County's alleged violation of the CBA, however, the Plaintiffs have failed to establish their entitlement to preliminary injunctive relief. For present purposes, the Court will assume, arguendo, that the County violated the CBA in numerous ways, as the Plaintiffs allege, when it implemented the assessment tests and resulting promotion eligibility lists without obtaining the prior consent of AFSCME. The Court may indulge in such assumptions because even if all of the Plaintiffs' allegations are true, they appear to be incapable of obtaining relief *in this judicial forum* for any breach of the CBA.

Ohio Revised Code Chapter 4117, the Ohio Public Employees' Collective Bargaining Act, provides, in relevant part, that "[a]n agreement between a public employer and an exclusive representative entered into pursuant to this chapter governs the wages, hours, and terms and conditions of public employment covered by the agreement. If the agreement provides for a final and binding arbitration of grievances, public employers, employees, and employee organizations are subject solely to that grievance procedure...." Ohio Rev.Code § 4117.10(A).[20]

---

**18.** Although the Sixth Circuit defines this branch of the four-part test in terms of harm to others, the focus is on the harm that a defendant will suffer if the requested injunctive relief is granted. It is with this factor that courts have traditionally balanced the equities (i.e., the harm that the plaintiff will suffer in the absence of an injunction is balanced against that which will befall the defendant if same is granted). *See Southern Ohio Coal Co. v. United Mine Workers of America*, 551 F.2d 695 (6th Cir.1977).

**19.** Although the Plaintiffs' Complaint contains numerous counts, the Court has concluded, based on its review of their Motion for a Preliminary Injunction and the evidence submitted during the oral and evidentiary hear-

ing, that they seek injunctive relief on only two grounds. *First,* they argue that the assessment tests at issue violate the terms of the CBA between Montgomery County and their labor union, AFSCME. *Second,* they contend that the assessment tests violate Title VII, because they have a disparate impact on African Americans.

**20.** State labor law governs this action, because political subdivisions such as Montgomery County and their employees are excluded from the statutory definition of "employers" subject to the National Labor Relations Act. *See* 29 U.S.C. § 152(2); *Moir v. Greater Cleveland Regional Transit Authority*, 895 F.2d 266, 269 (6th Cir.1990) (noting that while Section 301 of the NLRA, 29 U.S.C. § 185(a), pro-

In *Mayfield Heights Fire Fighters Ass'n, Local 1500 v. DeJohn,* 87 Ohio App.3d 358, 622 N.E.2d 380 (1993), the Cuyahoga County Court of Appeals recognized that " 'all matters affecting promotions' " in public employment " 'are appropriate subjects of collective bargaining.' " *Id.* at 382 (quoting *DeVennish v. City of Columbus,* 57 Ohio St.3d 163, 566 N.E.2d 668 (1991)). As a result, if promotions are addressed in a public employer's collective bargaining agreement that provides for final and binding arbitration of grievances, a complaining employee "is subject to the mandatory grievance procedures which must be exhausted before resort to the courts." [21] *Id.; see also Brannen v. Board of Educ., Kings Local School Dist.,* No. CA2000-11-098, 2001 WL 793001 (12th Dist. July 6, 2001) (unpublished) ("The collective bargaining agreement between OAPSE 27 and Kings provides for binding arbitration of grievances. Therefore, to the extent that appellants claim that the actions of Kings violated their rights under the collective bargaining agreement, binding arbitration is their exclusive remedy and the trial court had no jurisdiction to consider the merits of their complaint."); *Null v. Ohio Dept. of Mental Retardation and Developmental Disabilities,* 137 Ohio App.3d 152, 738 N.E.2d 105 (2000) (holding that the arbitration clause of a public employer's collective bargaining agreement left trial court without jurisdiction over an employee's claims).

In the present case, at least three of the Plaintiffs did grieve Montgomery County's use of the assessment tests to promote individuals into BMM positions. (*See, e.g.,* Def. Exh. 17). Specifically, they argued, just as they do now, that the promotional process used by the County violated various provisions of the applicable CBA. (*Id.*). They later withdrew their grievance, however, prior to participating in a scheduled arbitration. (Walker testimony, Doc. # 26 at 177–78; Lander testimony, Doc. # 26 at 44–45). Unfortunately for the Plaintiffs, the CBA between Montgomery County and AFSCME does address the issue of "filling vacancies" through promotions, and it does provide for final and binding arbitration of grievances. (*See* Complaint, Doc. # 1 at Exh. C, Art. 6 and 12). Given that (1) the applicable CBA provides for binding arbitration, (2) the Plaintiffs scheduled such an arbitration, and (3) they withdrew their grievance before participating in the scheduled arbitration, the Court concludes, based on the evidence introduced at the hearing on the Plaintiffs' Motion for a Preliminary Injunction, that they are not entitled to pursue their claims for breach of the CBA in this judicial forum. *See, e.g., Mayfield Heights Fire*

---

vides for federal jurisdiction in contract disputes between an employer and a union representing employees in an industry affecting commerce, 29 U.S.C. § 152(2) amended the NLRA to exclude political subdivisions from its definition of "employer").

**21.** The Ohio Eighth District Court of Appeals recently reaffirmed its holding in *Mayfield Heights,* reasoning as follows:

... While R.C. 4117.08(B) prohibits collective bargaining over all matters concerning pre-hire examinations and the establishment of pre-hire eligibility lists, matters that affect promotions are appropriate subjects for inclusion in collective bargaining agreements. *E.g., DeVennish v. Columbus* (1991), 57 Ohio St.3d 163, 566 N.E.2d 668, paragraphs one and two of the syllabus. Therefore, when "the subject of promotions is covered by the Agreement at issue, it is subject to the mandatory grievance procedures which must be exhausted before resort to the courts." *Mayfield Heights Fire Fighters Ass'n v. DeJohn* (1993), 87 Ohio App.3d 358, 362, 622 N.E.2d 380, referring, in part, to R.C. 4117.10(A). *East Cleveland Firefighters, Local 500 v. Civil Service Commission of East Cleveland,* Cuyahoga App. No. 77367, 2000 WL 1876394 (2000) (unpublished).

*Fighters,* 622 N.E.2d at 382; Ohio Rev. Code § 4117.10(A). As a result, they have failed to demonstrate their entitlement to injunctive relief, insofar as they argue that Montgomery County's reliance on the assessment testing process violated the CBA. With respect to this claim, the Plaintiffs have not shown any likelihood of success on the merits.

■ As noted above, however, the Plaintiffs also argue that the assessment testing process violates Title VII, because it has a negative and disparate impact on African Americans. The Plaintiffs' failure to exhaust the grievance and arbitration process does not bar them from pursuing their Title VII claim in this Court, and the Defendants make no argument to the contrary. *See, e.g., Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1260 (10th Cir.1998) (recognizing that "a Title VII plaintiff is not required to exhaust her employer's internal grievance procedures before filing suit"); *Johnson v. Greater Southeast Community. Hosp. Corp.,* 951 F.2d 1268, 1276 (D.C.Cir.1991) ("A private party alleging federal civil rights violations need not pursue internal administrative remedies before pressing a claim in federal court.").

Nevertheless, for the reasons to follow, the Court finds that the Plaintiffs have failed to demonstrate their entitlement to injunctive relief on the basis of their Title VII "disparate impact" claim. Under a "disparate impact" theory of discrimination,[22] "a plaintiff need not show that a defendant intended to discriminate, but must instead prove that a particular employment practice, although neutral on its face, has produced a significant adverse effect on a protected group to which the plaintiff belongs." *Kovacevich v. Kent State Univ.,* 224 F.3d 806, 830 (6th Cir. 2000). In order to prevail on such a claim, the Plaintiffs first must establish a prima facie case "by identifying and challenging a specific employment practice, and then show[ing] an 'adverse effect' by offering statistical evidence 'of a kind or degree sufficient to show that the practice in question has caused the' adverse effect in question." *Id.* (quoting *Scales v. J.C. Bradford & Co.,* 925 F.2d 901, 908 (6th Cir.1991)). "When a prima facie case is established, the defendants must articulate a legitimate business reason for the employment practice." *Id.* "Once a defendant has articulated that legitimate business reason, the burden shifts back to the plaintiff to show either that the employer's reason is a pretext for discrimination, or that there exists an alternative employment practice that would achieve the same business ends with a less discriminatory impact." *Id.*

The "specific employment practice" challenged by the Plaintiffs is the assessment testing process, which resulted in the eligibility lists used to fill BMM vacancies. Although this practice is neutral on its face (i.e., it does not openly discriminate against minorities), the Plaintiffs insist that it has had a negative, disparate impact on African Americans. In support of this proposition, they rely largely on the statistics set forth, *supra,* which show

---

**22.** Title VII also prohibits "disparate treatment" or intentional discrimination on the basis of race. Although the Plaintiffs' Complaint includes allegations of unlawful disparate treatment, counsel for the Plaintiffs made clear during final arguments held on December 20, 2000, that his clients are not pursuing any disparate treatment claims, at least for purposes of their Motion for a Preliminary Injunction. In any event, having reviewed the record, the Court sees absolutely no evidence that the Defendants adopted the assessment testing process with a discriminatory intent. To the contrary, the Court finds, based on the evidence before it, that the Defendants used the tests and the resulting promotion eligibility lists in an effort to address concerns brought to them by the NAACP and African American employees in the Public Works Department.

the number of African American test takers who passed each of the tests. In addition, as noted above, the Plaintiffs contend that, even among individuals who did pass one or more of the assessment tests, those tests had a disparate impact, because the scores of some well-qualified African Americans were lower than the scores of some less-qualified Caucasians, which resulted in whites being promoted first. Finally, the Plaintiffs suggest that the Defendants' decision to limit the test to employees of the Public Works Department disparately impacted African Americans employed elsewhere, as they were barred from participating in the testing process.

Upon review, the Court finds, based on the evidence before it, that none of the Plaintiffs has met the requirements for injunctive relief based on the foregoing assertions. As will be explained more fully, *infra,* none of the Plaintiffs has demonstrated a substantial likelihood of success on the merits. In addition, with the possible exception of Plaintiff Lander, none of the Plaintiffs has even raised "serious questions" going to the merits. Finally, as the Court will explain, *infra,* Plaintiff Lander cannot obtain injunctive relief because he has not shown any irreparable harm. In reaching these conclusions, the Court finds it necessary to discuss each of the Plaintiffs separately, because each is situated somewhat differently. In other words, the assessment testing process had a different impact on each of the four Plaintiffs. For example, Plaintiff Williams was ineligible to take any of the assessment tests because he works in the Montgomery County Sanitation Department. Plaintiff Pryor, who was working as a BMM II when the assessment tests were given, passed two skills tests, ranked 8th on the promotion eligibility list for a BMM III position, and received (and rejected) a promotion offer during the pendency of this litigation. Although Plaintiff Allen

was eligible to take the assessment tests, he refused to do so on the advice of his labor union. Finally, Plaintiff Lander took the BMM I mechanical reasoning and "information locating" test but failed to pass both portions. Given that the Plaintiffs are situated differently, the Court turns now an analysis of the preliminary injunction factors as they relate to each Plaintiff.

### 1. *Plaintiff Williams*

■ With respect to Plaintiff Williams, the relevant "specific employment practice" at issue is necessarily the decision to limit the assessment tests to Public Works Department employees. Given that Williams, a Sanitation Department employee, was not permitted to take the tests, the issue of whether the tests had a disparate impact on African Americans who took them is, at this point, immaterial, at least insofar as Williams is concerned. As a non-test-taker, Williams' complaint cannot be that the tests themselves had a disparate impact on him. Rather, his complaint is that the County violated Title VII by precluding him from taking the tests. Unless Williams can show that Montgomery County's decision to preclude him from taking the tests had an unlawful disparate impact on him and other African Americans, then the County had no obligation under Title VII to include him in the assessment testing process.

Upon review, the Court concludes that Williams has not shown any likelihood of success on the merits, because the Plaintiffs have not presented evidence establishing that Montgomery County's decision to limit the assessment tests to Public Works Department employees had a disparate impact on Williams and African Americans working elsewhere. In other words, the County's decision to preclude *all* individuals other than Public Works Department employees from the testing process un-

doubtedly had an adverse impact on Williams personally, but it had the same adverse impact on countless other African Americans and Caucasians alike. What the Plaintiffs have failed to show is that the County's decision to limit the test to Public Works Department employees had a *disparate* impact on African Americans who worked elsewhere. Absent probative statistical evidence on this crucial point, the Court concludes that Williams has not demonstrated a substantial likelihood of success on the merits.

As noted above, however, Williams' failure to show a substantial likelihood of success on the merits is not necessarily dispositive. "[A] finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, 'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.'" *Six Holding Corp., II v. Cafcomp Systems, Inc.,* 119 F.3d 393, 399–400 (6th Cir.1997); *see also In re Eagle–Picher Indus., Inc.,* 963 F.2d 855, 860 (6th Cir.1992) (same).

In the present case, however, the Court finds that Williams has failed even to raise "serious questions" going to the merits. The mere fact that Montgomery County adversely impacted Williams personally, by prohibiting non-Public Works Department employees from participating in the assessment tests, does nothing to establish that the policy of limiting the tests to Public Works Department employees had an unlawful *disparate* impact on qualified African Americans who were outside of the Public Works Department labor pool. During the October and November, 2000,

oral and evidentiary hearing, counsel for the Plaintiffs focused little attention on Williams [23] but did inquire several times whether various defense witnesses had considered the impact that the County's policy of offering the tests only within the Public Works Department would have on qualified African Americans who worked elsewhere. (*See, e.g.,* Trick testimony, Doc. # 25 at 31). Those witnesses responded in the negative, and the Plaintiffs have failed to show any "serious questions" going to the merits as to whether any adverse impact on African Americans actually resulted. Absent the existence of, at a minimum, serious questions going to the merits, the Court concludes that Williams is not entitled to injunctive relief, without regard to the other preliminary injunction factors. *See, e.g., Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153–54 (6th Cir.1991) ("[E]ven if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the defendant ..., he is still required to show, at a minimum, "serious questions going to the merits."); *Six Holding Corp.,* 119 F.3d at 399–400 (recognizing that, at a minimum, a plaintiff must show "serious questions going to the merits").

### 2. *Plaintiff Pryor*

■ With respect to Plaintiff Pryor, the Court notes that he passed both of the skills tests that he took. As a result of his scores, he ranked 8th on the promotion eligibility list for a BMM III position. (Pl. Exh. 70 at 3). During the pendency of this litigation, Montgomery County reached Pryor's spot on the list and offered him a promotion into a BMM III position on January 8, 2001. Pryor declined the offer,

---

**23.** During final arguments, counsel for the Plaintiffs acknowledged that "we haven't talked a lot about Mr. Williams...."

however, on the advice of his legal counsel, who informed the County that his client would not accept a promotion that resulted from the allegedly discriminatory assessment tests.

■ Given that Pryor *passed* the only assessment tests that he took, he appears unlikely to prevail under Title VII on the theory that the tests had a disparate impact on African Americans, who allegedly *failed* at a significantly higher rate than Caucasians. Even if African American as a whole did fail the tests in disproportionate numbers, Pryor did not. In order to have constitutional standing to bring a Title VII action, Pryor must show that he personally was injured by the Defendants' alleged discrimination and that his injury likely will be redressed by the relief sought. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). As a result, in the context of a disparate impact claim, Pryor must show that *he* was injured as a result of the policies or practices that are alleged to have had a disparate impact on the protected class to which he belongs. *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir.1996) (citing *Carpenter v. Board of Regents of Univ. of Wisc. Sys.*, 728 F.2d 911, 915 (7th Cir.1984)); *see also Maresco v. Evans Chemetics*, 964 F.2d 106, 115 (2nd Cir.1992) (reasoning that a "disparate impact" plaintiff must show, inter alia, that a specific employment practice actually excluded him or her, as a member of a protected group, from a job or promotion); *Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 451 (10th Cir.1981) ("It is not sufficient for an individual plaintiff to show that the employer followed a

discriminatory policy without also showing that plaintiff himself was injured."); *Robinson v. Polaroid Corp.*, 732 F.2d 1010, 1016 (1st Cir.1984) (same); *Cerrato v. San Francisco Community College Dist.*, 26 F.3d 968, 976 (9th Cir.1994) ("To prevail on [a disparate impact] claim, [a plaintiff] must show that the defendants employed certain hiring criteria that had an adverse impact on him and members of his group."); *Dix v. United Air Lines, Inc.*, 2000 WL 1230463 (N.D.Ill. Aug.28, 2000) (unpublished) ("Assuming for purposes of discussion that United in fact had an unlawfully discriminatory policy, Dix must have evidence that he was injured as a result of that policy."); *Verney v. Dodaro*, 872 F.Supp. 188, 194 (M.D.Pa.1995) (holding that a female employee lacked standing to pursue a disparate impact sex discrimination claim challenging a political patronage system because she personally did not suffer any injury as a result of the system), *aff'd*, 79 F.3d 1140 (3rd Cir.1996) (unpublished table disposition).[24]

In this case, Pryor has not shown that he personally was injured by any disparate impact that Montgomery County's assessment testing process may have had on African Americans as a group. Insofar as the Plaintiffs contend that the tests had a disparate impact on African Americans, who allegedly failed much more often than Caucasians, Pryor himself was not harmed because he passed the tests. Furthermore, given that he actually received a promotion offer based upon his rank on the BMM III promotion eligibility list, Pryor cannot demonstrate a disparate impact on the basis that the assessment tests had a dispa-

---

**24.** In some of the cases cited above, the court required the plaintiff to show, as part of the prima facie case, that he or she personally was injured by the practice that disparately impacted members of the protected class. Regardless of whether the issue is treated as one of standing or as a prima facie case requirement, the result in the present case is the same. For the reasons set forth more fully above, Pryor's disparate impact claim appears likely to fail, because he has not shown that he personally was injured by any Montgomery County policy or practice that had a disparate impact on African Americans.

rate impact on African Americans who, while passing the tests, may have been clustered together at the low end of the grading scale, without a realistic possibility of ever receiving a promotion.[25] Even if African Americans as a group generally did receive lower passing scores that, as a practical matter, precluded them from obtaining a promotion, Pryor is not a part of that group, as he placed high enough to receive a promotion offer.

In light of Pryor's failure to identify any injury to himself that (1) resulted from the alleged disparate impact of the assessment testing process and (2) could be redressed by a favorable ruling from the Court, it is questionable whether he even has standing to pursue a Title VII disparate impact claim. For the reasons set forth above, he certainly has failed to demonstrate a substantial likelihood of success on the merits, given that he passed the challenged tests and received a promotion offer.

Finally, Pryor has failed to make *any* showing of irreparable harm. On January 8, 2001, Montgomery County offered Prior a promotion into a BMM III position based on his rank on the eligibility list. Given that Pryor passed his two assessment tests and received an offer of promotion, it appears to the Court that his only conceivable "injury" is that he had to wait a period of months while the County extended offers to the seven individuals who placed ahead of him on the BMM III promotion eligibility list. Assuming, purely arguendo, that this wait somehow had

an unlawful disparate impact on Pryor and African Americans as a group, he arguably *might* be entitled to compensatory damages in the form of a retroactive pay increase and retroactive BMM III seniority from the time of the tests until the time that he received the offer of a promotion.[26] This type of injury, however, is not in any sense "irreparable." Given Pryor's failure to demonstrate either a substantial likelihood of success on the merits or irreparable harm, the Court finds, without consideration of the other preliminary injunction factors, that he is not entitled to injunctive relief.

### 3. *Plaintiff Allen*

■ With respect to Plaintiff Allen, the Court notes that he had the opportunity to participate in the assessment testing process, but twice refused to do so on the advice of an AFSCME representative. Given that Allen declined to participate in the assessment tests, however, the Court concludes, for the reasons to follow, that he appears unlikely to prevail under Title VII on the theory that the tests had a disparate impact on African American test takers, who allegedly failed at a significantly higher rate than Caucasians. The Court also concludes, for the reasons to follow, that he appears unlikely to prevail on the theory that African Americans who took and passed the tests were clustered together near the bottom of the eligibility lists and, therefore, lacked a realistic chance at a promotion.

---

**25.** Cf. *Waisome v. Port Authority of New York & New Jersey*, 948 F.2d 1370, 1377 (2nd Cir. 1991) ("[E]vidence that the [test] scores of members of a protected group were clustered at the low end of the grading scale—though such members may have passed the examination in sufficient numbers—provides support for a finding that the test had a disparate impact on that group, assuming that the clustering could not have occurred by chance.").

**26.** For present purposes, the Court will assume, arguendo, that Pryor might be entitled to such relief. It is not at all clear, however, that he would be entitled to recover *any* damages for the period of time after the testing process and before he received an offer of promotion, given that he *rejected the offer*. In other words, a fair argument can be made that the delay in offering Pryor a promotion did not injure him at all, as he declined the offer when he finally received it.

Like Plaintiff Pryor, Plaintiff Allen appears to be incapable of identifying any injury that *he* personally suffered as a result of the assessment testing process that he now challenges. Even if the tests had a disparate impact on the African Americans who took them, they had no such impact on Allen, who did not take the tests.[27] Thus, insofar as the Plaintiffs contend that the tests had a disparate impact on African Americans, who allegedly failed much more often than Caucasians, Allen himself was not harmed because he voluntarily boycotted the tests.[28] Furthermore, given that he refused to take the tests, Allen cannot demonstrate a disparate impact on the basis that the assessment tests adversely affected African Americans who, while passing them, may have been clustered together at the low end of the grading scale, precluding them from ever receiving a promotion. Even if African American test takers as a group generally did receive lower passing scores that, as a practical matter, prevented them from obtaining a promotion, Allen is not a member of that group, as he voluntarily declined to participate in the testing process.

In light of Allen's failure to identify any injury to himself that (1) resulted from the alleged disparate impact of the assessment testing process and (2) could be redressed by a favorable ruling from the Court, it is questionable whether he even has standing to pursue a Title VII disparate impact claim. For the reasons set forth above, he certainly has failed to demonstrate a substantial likelihood of success on the merits, given that he voluntarily boycotted the challenged tests on the basis that they violated the applicable CBA (an issue which, as noted above, cannot be litigated in this judicial forum). Furthermore, given his failure to identify *any harm* that he personally suffered as a result of the challenged testing process, Allen plainly cannot demonstrate *irreparable harm*. Absent a substantial likelihood of success on the merits or irreparable harm, the Court finds, without consideration of the other preliminary injunction factors, that Allen is not entitled to injunctive relief.

### 4. *Plaintiff Lander*

■ With respect to Plaintiff Lander, the relevant "specific employment practice" is Montgomery County's use of the BMM I mechanical reasoning and "information locating" test and its creation of a promotion eligibility list based upon the results of that test.[29] As noted, *supra*, Lander failed the mechanical reasoning portion of the test and, therefore, was not included on the BMM I promotion eligibility list. The next question, then, is wheth-

---

27. Notably, Allen's failure to participate did not stem from a personal belief that the tests would have a racially discriminatory disparate impact on African Americans, a result that would have been difficult, if not impossible, to predict prior to the tests actually being administered and graded. Rather, his refusal to take the tests stemmed from the advice of his union representative, who believed that the tests violated the terms of the applicable CBA. (*See* Allen testimony, Doc. # 26 at 195–96; Pl. Exh. 30).

28. Parenthetically, the Court notes Allen's insistence that he would have passed the tests if he had elected to take them. During the oral and evidentiary hearing, Allen testified with assurance that he did not have "any concern about passing." (Allen testimony, Doc. # 26 at 200). Insofar as Allen insists that he would have passed the tests, however, he harms his case. Like Plaintiff Pryor, if Allen had taken the tests and had *passed* them, then he would be unable to show an injury to himself, based on a theory that African American test takers generally *failed* at a disproportionately high rate.

29. Given that Lander took only the BMM I test, the relevant inquiry is whether *that test*, which was significantly different than the four BMM II and BMM III "skills" tests, had a disparate impact on African Americans.

er the Plaintiffs have demonstrated that the County's use of the BMM I test had a disparate impact on Lander and other African Americans. In an effort to make this showing, the Plaintiffs rely on statistics which reveal that six of eight Caucasians passed the BMM I test, whereas only four of twelve African Americans passed that test. (Pl.Exh.71(a)).

In a disparate impact case such as the present one, "the proper population for [statistical] analysis is the applicant pool or the eligible labor pool. The composition of this population is compared to the composition of the employer's workforce in a relevant manner, depending on the nature of the benefit sought." *Smith v. Xerox Corp.*, 196 F.3d 358, 368 (2nd Cir.1999). Applying the foregoing analysis, the Court is persuaded that the statistical disparity in the pass rates for Caucasians (seventy five percent) and African Americans (thirty three percent) in the BMM I "test taker" pool is indicative of a disparate impact on members of the Plaintiffs' race. Nevertheless, the Court finds these statistics less helpful to Lander than they might appear. A labor pool consisting of eight Caucasians and twelve African Americans is likely too small to produce statistically meaningful results. *See, e.g., Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 94 (6th Cir.1982) ("[S]implistic percentage comparisons based on small sample sizes are a basis for concern as to their relevancy."); *Carter v. NKC of America, Inc.*, 85 F.3d 628, 1996 WL 224065 (6th Cir. May 2, 1996) (unpublished) ("Carter also did not establish a prima facie case that NKC's evaluation procedure had a disparate impact on employees because of race or age.... At most, Carter has established that 11 black employees received lower scores from a higher level supervisor and that 7 white employees received higher scores. Generally, reliance on such a small statistical sample is suspect."); *Abbott v. Federal Forge, Inc.*, 912 F.2d 867, 875 (6th Cir. 1990) ("[W]hen considering the group of 27 employees hired during the moratorium in isolation, the small sample size lessens the significance of the statistics obtained."); *Fudge v. City of Providence Fire Department*, 766 F.2d 650, 658–59 and n. 10 (1st Cir.1985) (concluding that a pool of twenty four people is too small to support a disparate impact claim based solely on a statistical analysis). Given the small number of people who took the BMM I test, it is questionable whether Lander has presented "statistical evidence 'of a kind or degree sufficient to show that the practice in question has caused the' adverse effect in question." *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir.2000).

■ In any event, assuming that Lander has at least raised "serious questions" going to the merits, he is not entitled to injunctive relief, as he has made absolutely no showing of any irreparable harm. In reaching this conclusion, the Court notes that the assessment tests were a "one-time, special opportunity" that resulted from Montgomery County's "desire to provide continued internal advancement and promotional opportunities for Department of Public Works' employees." (Pl.Exh.35). The challenged tests will not be repeated. (Dinneen testimony, Doc. # 24 at 75, 85; Walker testimony, Doc. # 26 at 154; Pl. Exh. 72(a)). Furthermore, the BMM I promotion eligibility list is no longer being used, as it has been exhausted. (Trick testimony, Doc. # 25 at 116–17).

As a result of the foregoing facts, absolutely *nothing* remains for the Court to enjoin, at least with respect to the BMM I test and resulting rankings on the now-extinct BMM I promotion eligibility list. At this point, Lander is reduced to arguing that Montgomery County's *prior* use of the one-time assessment test and its *prior* use of the exhausted BMM I eligibility list had a disparate impact on African Ameri-

cans and deprived him of a deserved promotion into a BMM I position. If these assertions are correct, then Lander ultimately may be entitled to monetary damages or other corrective relief. The Court perceives no *irreparable* injury, however, that would warrant the issuance of a preliminary injunction.[30] Absent any such injury, the Court concludes, without consideration of the other preliminary injunction factors, that Lander has not established his entitlement to injunctive relief. *See Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) ("This Court has stated that '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies....'"); *Allee v. Medrano*, 416 U.S. 802, 814, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) ("[T]here remains the necessity of showing irreparable injury, 'the traditional prerequisite to obtaining an injunction' in any case."); *Younger v. Harris*, 401 U.S. 37, 46, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (recognizing that irreparable injury is "the traditional prerequisite to obtaining an injunction"); *see also Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir.1982) (recognizing "the basic obligation of the plaintiff to make a clear showing of the threat of irreparable harm[,]" which is "a fundamental and traditional requirement of all preliminary injunctive relief, since equity cannot intervene where there is an adequate remedy at law"); *E.E.O.C. v. Anchor Hocking Corp.*, 666 F.2d 1037, 1042 (6th Cir.1981) (recognizing "the time-honored require-

ment of a showing of irreparable injury" in order to obtain a preliminary injunction); *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 348 (6th Cir.1998), quoting *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir.1978) ("'The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'"); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000) ("Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."); *Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1232 (1st Cir.1993) (reasoning that "a federal court cannot dispense with the irreparable harm requirement in affording injunctive relief"); *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir. 1995) ("Because CityFed has made no showing of irreparable injury here, that alone is sufficient for us to conclude that the district court did not abuse its discretion by rejecting CityFed's request. We thus need not reach the district court's consideration of the remaining factors relevant to the issuance of a preliminary injunction."); *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir.1978) (identifying the existence of irreparable injury as "the sine qua non of injunctive relief").

## C. *Other Issues Raised by Plaintiffs*

For the reasons set forth above, the Court has determined that the Plaintiffs are not entitled to injunctive relief. In the

---

**30.** *See Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm.*, 259 F.2d 921, 925 (D.C.Cir. 1958) ("The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy nec-

essarily expended ... are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

interest of completeness, however, the Court briefly will address several other arguments raised by the Plaintiffs. In particular, during the October and November, 2000, oral and evidentiary hearing, the Plaintiffs elicited a substantial amount of testimony in an effort to show that Montgomery County's assessment tests were never validated and were not job related (i.e., the skills and knowledge measured by the assessment tests did not correlate with the skills and knowledge required to work as a Building Maintenance Mechanic I, II or III). In addition, the Plaintiffs sought to show that, if the assessment tests had been scored differently, Pryor and Lander, who actually took one or more of the tests, would have fared better in relation to Caucasian test takers. Finally, the Plaintiffs spent a significant amount of time attempting to establish that they would have fared better under a system similar to the old promotional system that was in place prior to the County's adoption of the challenged assessment tests.

For purposes of resolving the pending Motion for a Preliminary Injunction, the Court has simply assumed, arguendo, that each of the foregoing propositions is true. The Court has indulged in such assumptions because, even if the Plaintiffs' assertions are correct, they have failed to show their entitlement to injunctive relief. In

light of the Court's analysis, *supra*, the Plaintiffs are not entitled to an injunction, regardless of whether Montgomery County's assessment tests have been validated or are job related. In addition, for purposes of the Court's analysis herein, it is simply immaterial whether the County could have manipulated the test scores in such a way to produce a scenario under which the Plaintiffs and other African Americans either would have passed in greater numbers or would have ranked higher on the promotion eligibility lists. (*See* Trick testimony, Doc. # 25 at 50–58). Under a Title VII disparate impact analysis, the initial inquiry is whether the testing, scoring and ranking procedure *actually used* by the County had a disparate impact on the Plaintiffs and other members of their race. *See, e.g., Kovacevich,* 224 F.3d at 830 (recognizing that a plaintiff "first must establish a prima facie case 'by identifying and challenging a specific employment practice,' and then show[ing] an 'adverse effect' by offering statistical evidence 'of a kind or degree sufficient to show that the practice in question has caused the' adverse effect in question"). If the County's assessment testing, scoring and ranking process did not have a disparate impact on the Plaintiffs and other African Americans, then nothing in Title VII obligated the County to use a different system.[31] As explained more fully, *supra,*

31. In any event, absolutely nothing in Title VII obligated Montgomery County to adopt a scoring system that would have been optimal for the individual Plaintiffs in this case. During the oral and evidentiary hearing, counsel for the Plaintiffs demonstrated that Plaintiff Pryor would have ranked ahead of three Caucasians if the County had averaged all of a test taker's "skills test" scores rather than simply averaging the two highest scores and ignoring any others. (*See* Trick testimony, Doc. # 25 at 49–51). Upon review, the Court notes three problems with this observation. *First,* the County quite reasonably determined how the tests would be scored *before* they were administered. (Dinneen testimony,

Doc. # 24 at 74). *Second,* given that candidates for the BMM III positions were required to pass only two skills tests, they very well may not have attempted three or four tests if they had known beforehand that all of their test scores would be averaged. Instead, test takers likely would have taken skills tests in only their two "strongest" areas. Having been informed that only the two highest scores would be counted, however, test takers had nothing to lose by completing three or four of the tests. As a result, it would be improper now to hold those scores against the test takers by changing the scoring system after the fact. *Third,* while averaging all test scores may have benefitted Plaintiff Pryor

Plaintiffs Williams, Pryor and Allen have not shown a substantial likelihood that the County's testing, scoring and ranking process had a disparate impact on them. Although Plaintiff Lander arguably has made such a showing,[32] he is not entitled to injunctive relief, because the tests will not be repeated and the relevant promotion eligibility list has been exhausted. As a result, he has not shown *any* irreparable harm and, therefore, is not entitled to injunctive relief, regardless of whether the County could have devised a system that would have been more favorable to him.

Finally, for purposes of the Court's analysis herein, it is simply immaterial whether the Plaintiffs would have fared better under a system like the promotional system that was in place prior to the County's adoption of the challenged assessment tests.[33] In support of a Preliminary Injunction, the Plaintiffs argue that Montgomery County violated Title VII by "lowering the bar" and making its assessment tests so easy that less qualified Caucasians were able to pass them. As a result of this "dumbing down" of the tests, the Plaintiffs argue that the County enabled these less qualified Caucasians to "leapfrog" over them and to receive the available promotions. The Plaintiffs insist that they would have fared better if the County had not "lowered the bar" in this manner. As explained more fully above, however, the relevant inquiry under Title VII is not whether African Americans would have fared better under the old system. Rather, the crucial question is whether the system *actually used* by Montgomery County had a disparate impact on the Plaintiffs and other African Americans. In order to make this determination, the proper comparison is not between the old promotional system and the new promotional system. Indeed, the Plaintiffs cite no authority to support the proposition that Title VII obligates the County to use the promotional system of their choice or an old promotional system that they believe is more advantageous to them personally. Rather, the proper inquiry for purposes of the Plaintiffs' Title VII disparate impact claim is whether they have "shown that the tests in question select applicants for ... promotion in a racial pattern significantly different from that of the pool of applicants." *Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999). In other words, the relevant analysis is not whether African Americans fared worse on the County's new assessment tests (which allegedly "lowered the bar") than they did under the old promotional system. Instead, the crucial question is whether African Americans fared worse on the County's new assessment tests than Caucasians who participated in that as-

---

personally, such a system would have been detrimental to African American employees such as Brian Lofton, who scored relatively well on two skills test, electrical and carpentry, while failing the plumbing skills test and performing abysmally on the HVAC test (on which he answered only thirty percent of the questions correctly). (*See* Pl. Exh. 71(a)). If all four of Lofton's scores are averaged, he falls far behind Caucasian employee Ronald King on the BMM II promotion eligibility list. (*Id.*).

**32.** As explained more fully, *supra,* Lander has shown a significant statistical disparity in the pass rates of Caucasians and African Ameri-

cans who took the BMM I assessment test, but the pool of test takers is possibly too small to produce meaningful results.

**33.** The Plaintiffs insist that factors such as seniority and other considerations would have been relevant under the old promotional system required by their CBA and would have worked to their advantage. The Court finds this assertion to be somewhat curious, given that the Plaintiffs' *complaints* about the old promotional system in the Public Works Department are what prompted Montgomery County to meet with the NAACP and to overhaul its promotional process by implementing the challenged assessment tests.

sessment testing process. Based on the reasoning and citation of authority set forth above, the Court concludes that the Plaintiffs have not demonstrated their entitlement to injunctive relief on the grounds that the new assessment testing, scoring and ranking process actually used by Montgomery County had an unlawful disparate impact on them and other African Americans. Accordingly, their Motion for a Preliminary Injunction (Doc. # 2) will be overruled.

### IV. *Motion for an Order that no bond be required (Doc. # 3)*

The Plaintiffs filed this Motion on September 25, 2000, asking the Court not to require them to post a bond in order to obtain a preliminary injunction. Given that the Plaintiffs are not entitled to injunctive relief, however, their Motion for an Order that no bond be required (Doc. # 3) is overruled, as moot.

### V. *Motion for Conditional Class Certification (Doc. # 15)*

The Plaintiffs filed this Motion on November 8, 2000, seeking conditional class action certification, pursuant to Fed. R.Civ.P. 23(c)(1).[34] In particular, the Plaintiffs appear to have moved for certification of three sub-classes. *First,* they seek certification of a sub-class consisting of "those blacks employed within the Public Works Department who took and passed the assessment test, had seniority, skill or experience but were not promoted as required by the collective bargaining agreement." (Doc. # 15 at 2). *Second,* they seek certification of a sub-class comprised of "those blacks within the Public Works Department who could have taken the test but did not[,] because the assess-

ment test violated the collective bargaining agreement." (*Id.*). *Third,* they seek certification of a sub-class consisting of "those blacks employed outside of the public works Department who were and will be denied the opportunity to be considered for future promotions into the Public Works Department into the building maintenance mechanic positions because they are not on the eligibility list which required the of the [sic] assessment test and does not expire for 2 years from the date of the test." (*Id.*).

After identifying these sub-classes, the Plaintiffs allege that Montgomery County's "promotional practices" (i.e., promoting employees based on assessment tests and resulting eligibility lists) are discriminatory

> "because they: (1) do not comport with the job descriptions now in effect, (2) resulted in a waiver of the minimum job qualifications, (3) do not follow the posting provisions of the collective bargaining agreement that had a disparate impact on the putative class, (4) results in awarding promotions to non-journey level persons into jobs that set forth journey level qualifications, and (5) promote persons based on assessment tests that are at a tenth or eleventh grade high school level into the highest ranking BMM III jobs even though said assessment tests have not been shown to be necessarily related to the skills needed at Montgomery County, and have a discriminatory affect [sic] on the putative class which may possess the seniority, skill, experience and ability to do the work."

(*Id.* at 3–4).

After setting forth these allegedly discriminatory effects, the Plaintiffs simply

---

**34.** Rule 23(c)(1) provides: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so

maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

ask the Court "to grant their to [sic] conditionally certify the class as to the members noted above." (*Id.* at 4). In all, the Plaintiffs' Memorandum in Support of their Motion contains approximately two pages of analysis, absolutely *none* of which addresses the crucial class certification requirements of Rule 23.[35] For example, subsection (a) of Rule 23 contains four prerequisites that *all* must be met before a district court may certify a class.[36] If those prerequisites are satisfied, the party seeking certification still must demonstrate that the case fits within at least one of the subcategories of Rule 23(b).[37] Both the Supreme Court and the Sixth Circuit have required "rigorous analysis" of the Rule 23 class certification requirements. *See, e.g., General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998).

Despite the need for such "rigorous analysis," the Plaintiffs first mention the Rule 23 class certification requirements in their Reply Memorandum (Doc. # 30). Therein, they address all four of the Rule 23(a) requirements in less than two pages, while completely ignoring the additional requirements imposed by Rule 23(b). As a result, the Plaintiffs have failed to meet their burden of establishing the propriety of class certification, and their Motion for Conditional Class Certification (Doc. # 15) is overruled.

## VI. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Plaintiffs' Motion for a Preliminary Injunction (Doc. # 2) is overruled. The Plaintiffs' Motion for an Order that no bond be required (Doc. # 3) is overruled, as moot. The Plaintiffs' Motion in Limine (Doc. # 7) is overruled. The Plaintiffs' Motion for Discovery (Doc. # 9) is overruled, as moot. The Plaintiffs' Motion for Conditional Class Certification (Doc. # 15) is overruled.

Counsel of record will take note that a brief telephone conference will be held, between the Court and counsel, on Tuesday, September 4, 2001, at 8:20 a.m., to establish further procedures to be followed in this litigation. In particular, counsel should be prepared to discuss whether they wish to proceed to trial upon the merits of the captioned cause, or whether, in the alternative, the Plaintiffs wish to take an immediate appeal of this decision

---

**35.** The Plaintiffs also have filed a Supplemental Memorandum in Support of their Motion for Conditional Class Certification (Doc. # 20), which is equally silent with respect to the class certification requirements of Rule 23.

**36.** Rule 23(a) sets forth four prerequisites to class certification: (1) the class must be so numerous that "joinder of all members is impracticable;" (2) there must be "questions of law or fact common to the class;" (3) the claims of the representative party must be "typical" of the class; and (4) the representative party must be able to "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). The Plaintiffs' Memorandum in support of their Motion fails even to mention any of these factors.

**37.** Under Rule 23(b), at least one of the following three conditions must be met in order for a plaintiff to maintain a lawsuit as a class action: (1) there must be a risk of (a) inconsistent or varying adjudications with respect to individual class members, leading to incompatible standards of conduct for the party opposing the class, or (b) individual adjudications that would, as a practical matter, be dispositive of the interests of non-parties or substantially impair their interests; (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making it appropriate to order class-wide declaratory or injunctive relief; or (3) questions of law or fact common to the class predominate over questions affecting only individual members, and a class action is a superior method of adjudicating the dispute.

to the Sixth Circuit Court of Appeals, either from the Court's denial of the preliminary injunction or with the Court entering final judgment based on the findings of fact and conclusions of law set forth herein.